UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

      Plaintiff,

v.                                                                  Criminal Case No. 18-20008

Zongli Chang,

                                 Sean F. Cox
      Defendant.                      United States District Court Judge

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Armed with a warrant, federal agents searched Defendant's residence on the morning of

June 12, 2017.  Their objective? To find and seize Defendant's cell phone, for which they had a

second search warrant.  They did so, and, after seizing the phone, they asked Defendant to

unlock it using his passcode, which he did.  Because agents had observed patient files in plain

view, which they believed to be possible evidence of the suspected crimes, they also obtained

Defendant's consent to conduct a full search of the home.

Defendant has now moved to suppress all evidence seized from the search of his home

and cell phone.  He argues that the warrant for his cell phone lacked particularity, that the agents

obtained his passcode in violation of *Miranda*, and that he did not voluntarily consent to the

search of his residence.  The Court disagrees and, for the reasons below, shall deny the motions.

## BACKGROUND

Defendant, Zongli Chang, is charged with one count of conspiracy to distribute and

possess with intent to distribute controlled substances, 21 U.S.C. §§ 841(a)(1), 846; thirty-nine

counts of unlawful distribution of controlled substances, 21 U.S.C. § 841(a)(1); and three counts

of health care fraud, 18 U.S.C. § 1347 (Doc. # 1).  In June 2018, he filed two motions to suppress

(Doc. # 106, 115).  The Court held a hearing on these motions on July 13, 2018.

At the hearing, the Government presented two witnesses–United States Department of

Health and Human Services Officer of Inspector General Special Agent Michael Pemberton and

Federal Bureau of Investigation Special Agent Andrew Crump.  It also introduced several

exhibits: a sign-in log for the execution of the search warrant at Defendant's residence,

numerous pictures from the execution of that warrant, and an affidavit from FBI Special Agent

Brent Toboy.  The defense presented one witness–Defendant's son Jeffrey Chang–along with

Defendant, who testified on his own behalf.  The defense also introduced one exhibit–phone

records from the day of the search.

Now, having heard and observed the witnesses who testified at the evidentiary hearing,

allowing for the Court to assess credibility, having considered the exhibits submitted by the

parties, having considered the arguments presented by counsel, and having applied the governing

legal principles, the Court makes the following findings of fact and conclusions of law.[1]

## FINDINGS OF FACT

On June 9, 2017, Special Agents Michael Pemberton and Andrew Crump applied for

search warrants for a cell phone, residence, and office, all associated with Defendant, Dr. Zongli

Chang.  At issue here are the warrants for the residence and the cell phone.

Crump was the affiant for both warrants.  In them, he averred that Defendant had written

medically unnecessary prescriptions for controlled substances and had billed Medicare and other

---

[1] To the extent that a finding of fact is more properly a conclusion of law, and to the
extent that a conclusion of law is more properly a finding of fact, it should be so construed.

insurers for services that were not medically necessary and/or were not provided. Defendant had

used the cell phone at issue to make appointments with patients who wanted to buy narcotic

prescriptions. Crump also averred that, based on his experience and training, the phone would

contain evidence of communication between co-conspirators and other materials relating to the

crimes. More specifically, the affidavit noted that electronically stored information could serve

as direct evidence of the specified crimes and that forensic evidence could establish how the

phone was used, the purpose of its use, who used it, and when.

Based on the affidavits, agents obtained both search warrants. The warrant for

Defendant's residence specified only one item to be seized–Defendant's cell phone. The warrant

for the cell phone authorized the seizure of:

> All records and information on the Subject Devices described in
> Attachment A that constitute fruits, evidence, and instrumentalities of violations
> of Title 18, United States Code, Section 1347 (Health Care Fraud), and Title 21
> United States Code, Section 841(a)(1) (Unlawful Distribution of Controlled
> Substances)., including but not limited to:

> 1. Content of all call logs, contact lists, text messages, emails (including
> those sent, received, deleted and drafted), instant messages, social media account
> activity (including browser history, web page logs, and search terms entered by
> the user), photos, WhatsApp content and other electronic media constituting
> evidence, fruits, or instrumentalities of the violations described above;

> 2. Evidence of user attribution showing who used or owned the devices at
> the time the things described in this warrant were created, edited, or deleted, such
> as for example, logs, phonebooks, saved usernames and passwords, documents,
> and browsing history;

> 3. Evidence of the times the devices were used;

> 4. Passwords, encryption keys, and other access devices that may be
> necessary to access the devices;

> 5. Contextual information necessary to understand the evidence described
> in this attachment, all of which constitute evidence, fruits and instrumentalities of

the violation described above.

Federal agents executed the search warrant on Defendant's residence at about 7:00 a.m. on June 12, 2017. Initially, eight agents, including Pemberton and Crump, arrived and parked their vehicles in the street and the driveway. The agents approached the home, knocked on the door, and announced their presence. After about a minute, either Defendant or his wife answered the door.

The agents entered the residence, informing Defendant that they had a search warrant. As is typical, at least some of the agents had their weapons drawn, but kept close to their bodies and pointed down. The agents had Defendant, his wife, and their son exit the house and go onto the front porch while they did a security sweep. There, the agents briefly patted the three down. Pemberton and another agent remained with the family on the porch while other agents performed a security sweep of the residence.

The sweep lasted about ten minutes. Then, agents brought Defendant and his family back inside into the residence's foyer area. At this time, they informed Defendant that they had warrants for his residence, his cell pone, and his doctor's office.

Next, agents asked Defendant for his cell phone–the object of their search–which he provided. Agent Steven Oosterling went upstairs and retrieved the phone–an LG cell phone. When Oosterling returned with the phone, Crump asked Defendant for the passcode, again telling him that they had a warrant to search the phone. Defendant did not respond, so Crump asked him again for the passcode. This time, Defendant responded, indicating that the passcode was a pattern and that he could unlock the phone. Crump handed him the phone, but Defendant simply held it and did nothing. So, Crump asked Defendant again for the passcode and, this

time, Defendant unlocked his phone by entering the passcode. Agents then took the phone and secured it. During this brief interaction, Defendant was quiet, calm, contemplative, and alert. He never asked to speak to a lawyer, to see the warrant, or for permission to take any medication. And agents never told him that the warrant required him to unlock the phone.

Indeed, had Defendant refused to provide his passcode, the FBI had the ability to access it through other means. In his affidavit, FBI Special Agent Brent Toboy, a certified digital evidence forensic examiner responsible for the extraction and processing of digital evidence, averred that the FBI is able to extract data from an LG G5 cell phone even if the phone is locked by the user.[2] Defendant's phone, of course, was an LG phone.

After the agents secured Defendant's phone, their focus turned to expanding the scope of the search, a decision that was prompted by the discovery of patient files in various rooms in the house during the security sweep. By this time, Defendant and his family had moved to a living area nearby the foyer. Crump approached Defendant and asked for his consent to search the residence, presenting him with an FBI consent to search form. Initially, Defendant agreed to sign the form and give his consent. But, he seemingly had second thoughts, and asked to speak with his attorney. Agents granted this request immediately, allowing him to call his attorney using his son's cell phone. Defendant did so, but received no answer.

After the unsuccessful call, agents advised Defendant that they would be securing the

---

[2] Defendant objected to the affidavit on hearsay grounds. But the Rules of Evidence do not apply to evidence presented at suppression hearings. *United States v. Stepp*, 680 F.3d 651, 668 (6th Cir. 2012). And the Court has no reason to doubt the reliability or truthfulness of the statements in the affidavit. *See United States v. Boyce*, 797 F.2d 691, 693 (8th Cir. 1986) (holding the court "may accept hearsay evidence at a suppression hearing if the court is satisfied that the statements were made and that there is nothing to raise serious doubt about their truthfulness.").

premises and asking him to leave while they sought to expand the scope of the warrant. In response, Defendant indicated that he wanted to give consent to search. Before presenting him with the consent form, however, Crump stepped outside and contacted a federal prosecutor about how to proceed. When Crump returned, Defendant asked if he could consent only to the search and seizure of the patient files. Crump rejected this suggestion, telling Defendant that agents would seize any relevant evidence. At this point, Crump once again went outside to consult with the prosecutor. This time, when he returned, Defendant indicated that he wanted to consent to the search. He maintained this position even after Crump explained to him several times that he did not need to consent and could wait until he spoke to an attorney; indeed, Defendant was adamant about signing the form. So, Crump read through the form with Defendant and his wife and obtained their signatures. By signing, Defendant confirmed that he had been advised of his right to refuse consent and that he had given permission to search the residence voluntarily.

Once they received consent, agents began searching the residence. During the search, they seized the patient files along with a large sum of money that they discovered. Once the search was completed, they left the residence.

The account above, of course, was not the only story presented to the Court at the evidentiary hearing. Defendant's version of events differs in several key respects. According to the defense, once agents brought Defendant and his family back inside after the pat down, Defendant asked for the agents to show him the warrant. Despite making this request several times, agents refused, saying they would show it to him later.

Next, agents asked him for the location of his cell phone, which he provided and agents acquired. According to Defendant, a female agent had the phone and asked him to unlock it, a

request he repeatedly refused. Then, Crump told Defendant that he had to unlock it because the agents had a warrant. Defendant demurred, asking to speak to an attorney. But this request was also refused, with Crump reiterating that the warrant required Defendant to unlock the phone. When Defendant's additional requests to speak to an attorney and to see the warrant fell on deaf ears, he unlocked his phone with his fingerprint. Later, the female agent returned and told Defendant that he also needed to provide the phone's passcode, which he did.

After Defendant unlocked the phone, an agent approached him about seizing the medical records in the house. When asked, Defendant declined to give his consent to search the home. Indeed, he declined to give his consent several times and again asked to speak to an attorney. In response, agents told him that if he failed to consent they would have to obtain a warrant, meaning Defendant and his family would have to leave while agents secured the home. And eventually the agents gave him an ultimatum, stating he had one more chance to sign the form before he had to leave. Feeling trapped and threatened, Defendant gave in and signed the consent form, which he saw for the first time right before he signed it.

The Court, however, declines to give credence to Defendant's version of events. Having heard his testimony and viewed his demeanor, Defendant was simply not a credible witness. He was frequently evasive when answering questions, provided many non-responsive answers, and offered numerous unsolicited statements. Not only did his testimony differ from that of the agents in many material respects, but it also inexplicably deviated from their testimony on more mundane issues. For instance, Defendant testified that an unidentified female agent had control of his phone and asked him for his passcode. This, of course, differed from the agents' testimony that Crump had control of the phone and asked Defendant for his password. Finally,

7

the Court also does not find Jeffrey Chang to be a credible witness. His memory of the day was

shaky and his testimony differed from that of the agents in key respects. Instead, the Court

credits the testimony of Special Agents Pemberton and Crump, whose testimony was reliable

and consistent, and described the routine execution of a search warrant.

## CONCLUSIONS OF LAW

Defendant raises several issues in his motions to suppress, arguing that: (1) the warrant

for his cell phone lacked sufficient particularity; (2) the agents violated his Fifth Amendment

rights when they obtained the passcode that phone; and (3) he did not voluntarily give the agents

consent to search his home. The Court shall address each argument in turn.

## I. Particularity of the Warrant

Just as the search here began with a warrant, so too will the Court's analysis. Defendant

argues the warrant for his cell phone did not satisfy the Fourth Amendment's particularity

requirement, contending that it impermissibly authorized a general search of the entire phone and

failed to show how the phone contained evidence of a crime.[3]

"The Fourth Amendment demands that a search warrant 'particularly describ[e]' the

places law enforcement may search and the things they may seize." *United States v. Castro*, 881

F.3d 961, 964 (6th Cir. 2018). The "chief purpose" of this requirement is "to prevent general

searches by requiring a neutral judicial officer to cabin the scope of the search to those areas and

items for which there exists probable cause that a crime has been committed." *Baranski v.*

*Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms*, 452 F.3d 443, 441

---

[3] Defendant also argues that agents exceeded the scope of the warrant by telling him that
the warrant required him to unlock the phone. But, because the Court does not credit
Defendant's testimony, and instead finds that agents never demanded that he unlock his phone,
this argument fails.

(6th Cir. 2006). Thus, the scope of the warrant "should be confined to evidence relating to a specific crime, supported by probable cause." *United States v. Hanna*, 661 F.3d 271, 286 (6th Cir. 2011). The "degree of specificity required is flexible and will vary depending on the crime involved and the types of items sought." *United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001). When reading for particularity, a "commonsense contextual reading" suffices. *Castro*, 881 F.3d at 965. This "contextual reading" includes reading the warrant together with the supporting affidavit. *See United States v. Richards*, 659 F.3d 527, 537 (6th Cir. 2011) (observing that the "particularity requirement may be satisfied through the express incorporation or cross-referencing of a supporting affidavit that describes the items to be seized").

Read as a whole, the warrant and supporting affidavit met the particularity requirement. "A warrant that empowers police to search for something satisfies the particularity requirement if its text constrains the search to evidence of a specific crime." *Castro*, 881 F.3d at 965. Here, as in *Castro*, the warrant affidavit noted that there was probable cause to believe that evidence of specific crimes–unlawful distribution of controlled substances and health care fraud–would be found on the phone. *Id*. In support, the affidavit provided that Defendant had used the phone to facilitate the commission of the crimes and referred to the affiant's own training and experience. The warrant also constrained the search to a list of particular items to be seized, which was even further limited to those records and information constituting "fruits, evidence, and instrumentalities" of the two specified crimes.

True, this list encompassed a wide swath of records and information. But this was not unreasonable. The search of a cell phone, like a computer, "may be as extensive as reasonably required to located the items described in the warrant based on probable cause." *See Richards*,

9

659 F.3d at 538, quoting *United States v. Burgess*, 576 F.3d 1078, 1092 (10th Cir. 2009). And

when the search is limited to a search for evidence explicitly authorized in the warrant, it is

reasonable for officers to search various records and applications on the phone to determine

whether they contain this evidence. *See id*. at 540. Because the warrant was so limited here, and

did not permit a free-ranging search, it did not violate the particularity requirement.

Even if it had, the good-faith exception to the exclusionary rule would apply. *United*

*States v. Leon*, 468 U.S. 897, 918-21 (1984). A "simple glance" at the warrant would not have

revealed "deficiencies glaring enough to make reliance on it unreasonable." *Castro*, 881 F.3d at

966; *see also Richards*, 659 F.3d at 542-43. Simply put, the agents reliance on the warrant was

"not the kind of 'deliberate, reckless, or grossly negligent disregard for Fourth Amendment

rights' that triggers suppression." *Id*., quoting *Davis v. United States*, 564 U.S. 229, 238 (2011).

## II. Custodial Interrogation

Now, to the agents' conduct during the search itself. Defendant argues that his Fifth

Amendment rights were violated when agents did not provide him with his *Miranda* rights

before having him provide the passcode to his cell phone. *Cf. United States v. Kirschner*, 823

F.Supp.2d 665, 668 (E.D. Mich. 2010) (holding that requiring the defendant to provide the

password he used for his computer to a grand jury would violate the Fifth Amendment)

The Fifth Amendment protects an individual from being "compelled in any criminal case

to be a witness against himself." To protect this right, law-enforcement officers must give

*Miranda* warnings before interrogating individuals that the officers have placed "in custody."

*United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009). The key question, then, is whether

the police-citizen interaction was a "custodial encounter." *See id*. To decide this question, the

Court considers "all of the circumstances," "with 'the ultimate inquiry' turning on whether 'a

formal arrest' occurred or whether there was a 'restraint on freedom of movement of the degree

associated with a formal arrest.'" *Id*., quoting *Stansbury v. California*, 511 U.S. 318, 322 (1994).

This latter question turns on how a reasonable person would view the breadth of his freedom of

action. *Id*. "Several factors guide the inquiry: the location of the interview; the length and

manner of questioning; whether the individual possessed unrestrained freedom of movement

during the interview; and whether the individual was told she need not answer the questions."

*Id*.

Because no formal arrest occurred, the question is whether Defendant's freedom was

restrained in a way similar to a formal arrest. To begin, Defendant faces an up-hill climb; in-

home encounters between police and citizens are generally non-custodial. *Id*. at 466; *United*

*States v. Salvo*, 133 F.3d 943, 950 (6th Cir. 1998) ("[W]hen police question a suspect in a

residence, these circumstances often do not rise to the kind of custodial situation that necessitates

*Miranda* warnings, whether they are free to leave or not.").

The surrounding circumstances do not tip the scales in the other direction. The

questioning itself was brief; agents simply asked Defendant to unlock his phone and, when he

did not initially respond, asked him twice more. This interaction lasted minutes at most, well-

short of the duration of other encounters that the Sixth Circuit has deemed non-custodial. *See*

*Panak*, 552 F.3d at 467 (interview lasting between 45 minutes and an hour); *United States v.*

*Mahan*, 190 F.3d 416, 420, 422 (6th Cir. 1999) (hour-and-a-half interview); *United States v.*

*Tummins*, 517 F. App'x 342, 343 (6th Cir. 2013) (two hour interview). During this encounter,

Defendant was not handcuffed or physically restrained in any way. *Panak*, 552 F.3d at 467;

*United States v. White*, 270 F.3d 356, 366 (6th Cir. 2001). Agents never brandished their

firearms, threatened Defendant, or made any showing of force. *United States v. Crossley*, 224

F.3d 847, 862 (6th Cir. 2000). Instead, they spoke to Defendant in a calm, conversational

manner, simply asking him for the passcode to his cell phone. *United States v. Luck*, 852 F.3d

615, 621 (6th Cir. 2017). Defendant never asked to speak to a lawyer or to see the warrant. And

although Defendant was never told that he could refuse to provide his passcode, this advice is

not required for an interaction to be non-custodial. *See Panak*, 552 F.3d at 467 ("It would be

strange, indeed, to say that a telltale sign of whether an individual must be Mirandized is whether

the officer gave the individual one of the *Miranda* warnings–that she need not answer the

questions."). All and all, these circumstances show that Defendant was not in custody.

That the encounter occurred during the execution of a search warrant does not alter this

conclusion. True, the execution of a warrant is a step apart from certain police-citizen

encounters like the one in *Panak*, in which investigators simply visited the defendant's residence

and asked her questions. *See* 552 F.3d at 464-65. There may be a more sizable police presence,

officers may be armed, and the defendant will often not be immediately free to leave. *See*

*Michigan v. Summers*, 452 U.S. 692, 705 (1981) (holding law enforcement officers have the

"limited authority to detain the occupants of the premises while a proper search is conducted.").

Yet this does not automatically transform the encounter into one akin to a formal arrest, the

balance of the circumstances must still suggest that this is the case. *See United States v.*

*Williams*, 760 F.3d 811, 815 (8th Cir. 2014) ("Any warrant search is inherently police

dominated; there is nothing untoward about that circumstance."). Indeed, the Sixth Circuit has

repeatedly held in-home questioning during the execution of a search warrant to be non-

custodial. *See, e.g.*, *United States v. Tummins*, 517 F. App'x 342, 343 (6th Cir. 2013); *United*

*States v. Gillman*, 432 F. App'x 513, 516 (6th Cir. 2011); *United States v. Haque*, 315 F. App'x

510, 519 (6th Cir. 2009); *United States v. Jewell*, 16 F. App'x 295, 297-98 (6th Cir. 2001). This

case is no different. Viewing all of the circumstances, Defendant was not asked for his passcode

in a setting akin to a formal arrest. Thus, he was not in custody and his Fifth Amendment

challenge fails.

Finally, even if the agents had violated his Fifth Amendment rights, any evidence obtained from his phone would still be admissible under the inevitable discovery doctrine. *See Nix v. Williams*, 467 U.S. 431, 446 (1984) (declining to apply the exclusionary rule when "the evidence in question would inevitably have been discovered without reference to the police error or misconduct"); *United States v. Hilton*, 625 F. App'x 754, 759 (6th Cir. 2015) (observing that "the inevitable discovery doctrine applies with equal force to potential Fifth Amendment violations."). For this doctrine to apply, the Government must show either "the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Hodge*, 714 F.3d 380, 387 (6th Cir. 2013). "This burden is met if the government shows that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." *Id*. (quotation marks omitted).

The Government has made that showing here. When agents asked Defendant to unlock his phone, they had already obtained a separate, valid search warrant for the phone's contents. And, according to Special Agent Toboy's affidavit, the FBI is able to extract data from an LG cell phone–the same model as Defendant's phone. So, even if Defendant had not unlocked his phone upon the agents' request, it was inevitable that routine procedures would have allowed the Government to access the phone and any evidence contained therein.

### III. Consent to Search the Home

Finally, Defendant objects to the search of his home after his cell phone had been seized, arguing that he did not voluntarily consent to the search.

"The Fourth Amendment permits a search without a warrant if valid consent to search is given." *United States v. Lucas*, 640 F.3d 168, 174 (6th Cir. 2011). The Government has the

burden to show that consent was voluntary, unequivocal, specific, intelligently given, and not influenced by duress or coercion. *Id.* Factors to consider include: age, intelligence, education, whether Defendant understood the right to refuse consent, the length and nature of detention, any use of coercive or punishing conduct by police, and any indications of subtler forms of coercion. *Id.*

The Government has met its burden here. Defendant is very well-educated and is familiar with his constitutional rights. When asking for consent, agents did not use any coercive tactics; they did not brandish their weapons, physically restrain Defendant, or threaten him in any way. To the contrary, they allowed Defendant to call his attorney when he asked to do so. And Agent Crump took great care to ensure that Defendant understood his rights, explaining to him that he did not need to consent and fully informing him what consent to search the residence would entail. All of this shows that Defendant's consent to search was freely and unequivocally given.

Defendant argues, however, that agents coerced him by telling him that they planned to obtain a warrant to search the residence and that he would have to leave the premises while they did so. But it is well-settled that statements to this effect do not taint the subsequent search if they are true and not a pretext to coerce the defendant. *See Lucas*, 640 F.3d at 174 (holding that a warning that a search warrant would be sought if consent was not given did not taint the search); *Salvo*, 133 F.3d at 954 (same); *United States v. Bond*, 433 F. App'x 441, 445 (6th Cir. 2011) (observing that the threat to obtain a warrant can taint consent if the threat is baseless or pretextual). That is the case here; the agents had already observed the patient files they sought in plain view during the protective sweep and were ready and willing to obtain a warrant. Thus, the Court finds that Defendant voluntarily consented to the search of his home.

**CONCLUSION AND ORDER**

For the reasons above, IT IS ORDERED that Defendant's Motion to Suppress is

DENIED.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: July 31, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on July 31, 2018, by electronic and/or ordinary mail.

s/Karri Sandusky on behalf of
Jennifer McCoy,Case Manager